# UNITED STATES DISTRICT COURT

for the

Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Apple iPhone 12<br>Seizure No. 2021250300110501-0004 | )<br>)<br>)   Case No.   '21  MJ3520<br>)<br>)<br>) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A, incorporated herein by reference.

located in the _____ SOUTHERN _____ District of _____ CALIFORNIA _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 952, 960 and 963 | Importation of a Controlled Substance; Conspiracy To Commit the Same |

The application is based on these facts:

See Attached Affidavit of Homeland Security Investigations Special Agent Mohammed Rahman incorporated herein by reference.

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Mohammed Rahman, HSI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means).*

Date:  09/10/2021

City and state:  San Diego, California

_____
*Judge's signature*

Hon. Allison H. Goddard, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT

I, Special Agent Mohammed Rahman, being duly sworn, hereby state as follows:

### INTRODUCTION

1.    I submit this affidavit in support of an application for a warrant to search the following electronic device:

> Apple iPhone 12
>
> Seizure No. 2021250300110501-0004
>
> ("Target Device")

as further described in Attachment A, and to seize evidence of crimes, specifically violations of Title 21, United States Code, Sections 952, 960, and 963 as further described in Attachment B.  The requested warrant relates to the investigation and prosecution of Jose Manuel MARTINEZ-Chavez ("MARTINEZ" or "Defendant") for importing approximately 49.36 kilograms (108.82 pounds) of methamphetamine from Mexico into the United States.  The Target Device is currently in the evidence vault located at 2051 North Waterman Avenue, Suite 100 El Centro, CA 92243.

2.    The information contained in this affidavit is based upon my training, experience, investigation, and consultation with other members of law enforcement. Because this affidavit is made for the limited purpose of obtaining a search warrant for the Target Device, it does not contain all the information known by me or other agents regarding this investigation.  All dates and times described are approximate.

### BACKGROUND

3.    I am a Special Agent with HSI and have been so employed since April 2017. I have conducted criminal investigations of or relating to narcotics smuggling and other crimes. I am a graduate of the Federal Law Enforcement Training Center in Glynco, Georgia.  I have received specific training in the area of narcotics investigations, and I have training and experience in the methods used by narcotics traffickers to import and distribute drugs. I am presently assigned to a Contraband Smuggling Group in El Centro, California, and my duties include investigating the illicit trafficking of controlled substances into the

1

1   United States of America.  I am cross-designated by the United States Drug Enforcement
2   Administration to conduct narcotics investigations and enforce the provisions of the
3   Federal Controlled Substance Act, pursuant to Title 21, United States Code.

4        4.    Through training and experience, I have become familiar with narcotics
5   trafficking techniques and the means used by narcotics traffickers to store and retrieve
6   information pertinent to their criminal activities.  Based on my training and experience, as
7   well as my consultations with other law enforcement personnel, I know that drug traffickers
8   commonly use electronic devices such as cellular telephones, personal digital assistants
9   (PDA), and computers to store names, telephone numbers, records, drug ledgers, and other
10   information pertaining to drug trafficking activity.

11        5.    I am aware that it is common practice for narcotics traffickers to work in
12   concert utilizing cellular telephones.  A common tactic utilized by narcotics traffickers is
13   to smuggle controlled substances into the United States from Mexico by concealing the
14   controlled substances in vehicles, on pedestrians, or in items belonging to pedestrians that
15   enter the United States at Ports of Entry such as the Calexico East and West Ports of Entry
16   and the Andrade Port of Entry.  With respect to the importation of narcotics in this manner,
17   I am aware that narcotics traffickers in Mexico frequently communicate with the individual
18   responsible with bringing the concealed narcotics into the United States.   These
19   communications can occur before, during and after the narcotics are imported into the
20   United States.  For example, prior to the importation, narcotics traffickers frequently
21   communicate with the smuggler regarding arrangements and preparation for the narcotics
22   importation.   When the importation is underway, narcotics traffickers frequently
23   communicate with the smuggler to remotely monitor the progress of the narcotics, provide
24   instructions to the smuggler and warn accomplices about law enforcement activity.  When
25   the narcotics have been imported into the United States, narcotics traffickers may
26   communicate with the smuggler to provide further instructions regarding the transportation
27   of the narcotics to a destination within the United States.

28

1    6.    Based upon my training, experience, and consultations with law enforcement
2    officers experienced in narcotics trafficking investigations, and all the facts and opinions
3    set forth in this affidavit, I am aware that cellular telephones (including their SIM card(s))
4    can and often do contain electronic evidence, including, for example, phone logs and
5    contacts, voice and text communications, and data, such as emails, text messages, chats
6    and chat logs from various third-party applications, photographs, audio files, videos, and
7    location data. This information can be stored within disks, memory cards, deleted data,
8    remnant data, slack space, and temporary or permanent files contained on or in the cellular
9    telephone. Specifically, searches of cellular telephones of individuals involved in the
10   importation of narcotics may yield evidence:

11   a.    tending to indicate efforts to import controlled substances from Mexico
12         into the United States;

13   b.    tending to identify accounts, facilities, storage devices, and/or services–
14         such as email addresses, IP addresses, and phone numbers–used to
15         facilitate the importation of controlled substances from Mexico into the
16         United States;

17   c.    tending to identify co-conspirators, criminal associates, or others involved
18         in importation of controlled substances from Mexico into the United
           States;

19   d.    tending to identify travel to or presence at locations involved in the
20         importation of controlled substances from Mexico into the United States,
21         such as stash houses, load houses, or delivery points;

22   e.    tending to identify the user of, or persons with control over or access to,
23         the Target Device; and/or

24   f.    tending to place in context, identify the creator or recipient of, or establish
25         the time of creation or receipt of communications, records, or data involved
           in the activities described above.

26

27

28

## FACTS SUPPORTING PROBABLE CAUSE

7.     On July 29, 2021, at approximately 12:30 p.m., Jose Manuel MARTINEZ-Chavez ("MARTINEZ" or "Defendant"), a United States Citizen, applied for entry into the United States at the Calexico, California West Port of Entry via the vehicle primary lanes. MARTINEZ was the driver and sole occupant of a silver Volkswagen Jetta. MARTINEZ presented his United States Passport Card to a Customs and Border Protection Officer ("CBPO"). MARTINEZ advised the CBPO that he lives in Mexicali, Mexico and was on his way to buy groceries in Calexico, California. MARTINEZ gave a negative Customs declaration.

8.     The CBPO at primary began to inspect the vehicle and noticed a strong odor. The CBPO tapped a quarter panel and noticed that it felt solid, as if the space of the quarter panel was filled. The CBPO then inspected the trunk and spare tire, and noticed the spare tire also felt solid. Picking up the spare tire, the CBPO noticed that it felt heavy, and when he tried to bounce it, the tire did not bounce. MARTINEZ and the vehicle were referred to secondary inspection.

9.     A CBPO operating the Z-Portal scanned the vehicle and noticed anomalies in both doors and the spare tire. The CBPO notified officers in the secondary lot of these findings. Upon further review of the Z-Portal image, the CBPO also observed anomalies in the gas tank, rear seats, and quarter panels.

10.    A CBPO handling a Human and Narcotics Detection Dog screened the vehicle, and the canine alerted to the driver's side door.

11.    MARTINEZ was placed in handcuffs and escorted to the secondary office, where a full pat-down was conducted. The CBPO conducting the pat-down retrieved an Apple iPhone (the Target Device) MARTINEZ's front left pocket, as well as a check, 360 Mexican pesos, and $204.

12.    Upon further inspection, CBPOs discovered and extracted from the vehicle a total of 91 packages concealed within it: 29 from the gas tank, 17 from the spare tire, 8 from the driver side door, 7 from the front passenger door, 7 from the driver side rear door,

1  7 from the passenger side rear door, 7 from the driver side quarter panels, 5 from the back
2  seats, 3 from the passenger side quarter panels, and 1 from the front passenger seat.
3  Together, the packages had a total weight of approximately 49.36 kilograms (108.82
4  pounds).

5      13.    A CBPO used a Gemini Thermo Scientific analyzer to test some of the
6  packages. A sample of the substance contained within the packages tested positive for the
7  characteristics of methamphetamine.

8      14.    MARTINEZ was placed under arrest and charged with a violation of Title 21,
9  United States Code sections 952 and 960, for Importation of a Controlled Substance.

10      15.    MARTINEZ was advised of his *Miranda* rights by Special Agents with
11  Homeland Security Investigations. He agreed to waive them and speak to agents without
12  the presence of an attorney. In summary, MARTINEZ stated that he did not know about
13  the narcotics in the vehicle or know what was in the car. He then stated that he thought he
14  was smuggling $40,000 in cash into the United States to be dropped off at a mall in or
15  around El Centro. MARTINEZ said he had crossed once before with what he thought was
16  $40,000 and was paid $500. He said that, on this occasion, he received a prepayment of
17  $200 and expected to be paid $1,800 more, for a total of $2,000, upon his delivery of the
18  cash. MARTINEZ also stated that he left the vehicle at a carwash the day before so that it
19  could be loaded with cash, and that day and the previous time he crossed with what he
20  thought was cash, he waited approximately nine hours for the car to be returned to him.
21  MARTINEZ stated there were messages on his phone relating to this smuggling activity.

22      16.    Based upon my experience and training, consultation with other law
23  enforcement officers experienced in narcotics trafficking investigations, and all the facts
24  and opinions set forth in this affidavit, I believe that telephone numbers, contact names,
25  electronic mail (email) addresses, appointment dates, messages, pictures, and other digital
26  information are stored in the memory of the Target Device. In light of the above facts and
27  my experience and training, there is probable cause to believe that Defendant was using
28  the Target Device to communicate with others to further the importation of illicit narcotics

1  into the United States. Further, in my training and experience, narcotics traffickers may be
2  involved in the planning and coordination of a drug smuggling event in the days and weeks
3  prior to an event. Co-conspirators are also often unaware of a defendant's arrest and will
4  continue to attempt to communicate with a defendant after their arrest to determine the
5  whereabouts of the narcotics. Based on my training and experience, it is also not unusual
6  for individuals, such as Defendant, to attempt to minimize the amount of time they were
7  involved in their smuggling activities, and for the individuals to be involved for weeks and
8  months longer than they claim. Accordingly, I request permission to search the Target
9  Device for data beginning on June 30, 2021, up to and including July 30, 2021, the day
10  after MARTINEZ's arrest.

11  **METHODOLOGY**

12      17.    It is not possible to determine, merely by knowing the cellular telephone's
13  make, model and serial number, the nature and types of services to which the device is
14  subscribed and the nature of the data stored on the device. Cellular devices today can be
15  simple cellular telephones and text message devices, can include cameras, can serve as
16  personal digital assistants and have functions such as calendars and full address books and
17  can be mini-computers allowing for electronic mail services, web services and rudimentary
18  word processing. An increasing number of cellular service providers now allow for their
19  subscribers to access their device over the internet and remotely destroy all of the data
20  contained on the device. For that reason, the device may only be powered in a secure
21  environment or, if possible, started in "flight mode" which disables access to the network.
22  Unlike typical computers, many cellular telephones do not have hard drives or hard drive
23  equivalents and store information in volatile memory within the device or in memory cards
24  inserted into the device. Current technology provides some solutions for acquiring some of
25  the data stored in some cellular telephone models using forensic hardware and software.
26  Even if some of the stored information on the device may be acquired forensically, not all
27  of the data subject to seizure may be so acquired. For devices that are not subject to forensic
28  data acquisition or that have potentially relevant data stored that is not subject to such

acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

18.     Following the issuance of this warrant, I will collect the Target Device and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

19.     Based on the foregoing, identifying, and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within 90 days, absent further application to this court.

**PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE**

20.     Law enforcement has not previously attempted to obtain the evidence sought by this warrant.

//
//
//
//
//
//
//
//
//
//
//
//
//

**CONCLUSION**

21.    Based on the facts and information set forth above, I submit there is probable cause to believe that a search of the Target Device will yield evidence of Defendant's violations of Title 21, United States Code, Sections 952, 960 and 963.   Accordingly, I request that the Court issue a warrant authorizing law enforcement to search the item described in Attachment A and seize the items listed in Attachment B using the above-described methodology.

I swear the foregoing is true and correct to the best of my knowledge and belief.

Special Agent Mohammed Rahman
Homeland Security Investigations

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 10th day of September, 2021.

HON. ALLISON H. GODDARD
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

PROPERTY TO BE SEARCHED

The following property is to be searched:

> Apple iPhone 12
>
> Seizure No. No. 2021250300110501-0004
>
> ("Target Device")

The Target Device is currently in the possession of Homeland Security Investigations, 2051 North Waterman Avenue, Suite 100 El Centro, CA 92243.

## ATTACHMENT B

### ITEMS TO BE SEIZED

Authorization to search the cellular telephone described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone for evidence described below. The seizure and search of the cellular telephone shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular telephone will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of June 29, 2021, up to and including July 29, 2021.

a.    tending to indicate efforts to import methamphetamine or some other federally controlled substances from Mexico into the United States;

b.    tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of methamphetamine or some other federally controlled substances from Mexico into the United States;

c.    tending to identify co-conspirators, criminal associates, or others involved in importation of methamphetamine, or some other federally controlled substance(s), from Mexico into the United States;

d.    tending to identify travel to or presence at locations involved in the importation of methamphetamine or some other federally controlled substances from Mexico into the United States, such as stash houses, load houses, or delivery points;

e.    tending to identify the user of, or persons with control over or access to, the Target Device; and/or

f.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

which are evidence of violations of Title 21, United States Code, Sections 952, 960 and 963.